LAW OFFICES

# BRODSKY SMITH

9595 WILSHIRE BLVD., SUITE 900
BEVERLY HILLS, CA 90212

877.534.2590
FAX 310.247.0160
www.brodskysmith.com

| | | |
|---|---|---|
| NEW JERSEY OFFICE | NEW YORK OFFICE | PENNSYLVANIA OFFICE |
| 1310 N. KINGS HIGHWAY | 240 MINEOLA BOULEVARD | TWO BALA PLAZA, STE 805 |
| CHERRY HILL, NJ 08034. | MINEOLA, NY 11501 | BALA CYNWYD, PA 19004 |
| 856.795.7250 | 516.741.4977 | 610.667.6200 |

July 17, 2023

| | |
|---|---|
| Matheson Tri-Gas, Inc.<br>Attn: Adam Awkal<br>6775 Central Ave<br>Newark, CA 94560 | Matheson Tri-Gas, Inc.<br>C/o CT Corporation System, Agent for Service of Process<br>300 North Brand Blvd., Suite 700<br>Glendale, CA 91203 |
| Matheson Tri-Gas, Inc.<br>Attn: James Murphree<br>1700 Scepter Road<br>Waverly, TN 37185 | Matheson Tri-Gas, Inc<br>Attn: General Counsel<br>909 Lake Carolyn Parkway, Suite 1100<br>Irving, TX 75039 |
| Administrator<br>U.S. Environmental Protection Agency<br>Mail Code: 1101A<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460 | Executive Officer<br>Regional Water Quality Control Board<br>San Francisco Bay Region<br>1515 Clay Street, Suite 1400<br>Oakland, CA 94612 |
| Regional Administrator<br>U.S. EPA, Region 9<br>75 Hawthorne Street<br>San Francisco, CA 94105 | Executive Director<br>State Water Resources Control Board<br>1001 I Street<br>Sacramento, CA 95814 |

Re:    Notice of Violation and Intent to File Suit under the Clean Water Act

To Whom It May Concern:

Brodsky Smith ("Brodsky Smith") represents Jason Johnson ("Johnson" or "Plaintiff") a citizen of the State of California.  This letter is to give notice that Brodsky Smith, on Johnson's behalf, intends to file a civil action against Matheson Tri-Gas, Inc. ("Matheson") for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA") at Matheson's Facility located at 6775 Central Ave., Newark, CA 94560 (the "Facility").

Johnson is a citizen of the State of California who is concerned with the environmental health the San Francisco Bay, and uses and enjoys the waters of the San Francisco Bay, its inflows and outflows, and other areas of the overall San Francisco Bay Watershed, of which the San Francisco Bay is a part.  Johnson's use and enjoyment of these waters are negatively affected by the pollution caused by Matheson's operations. Additionally, Johnson acts in the interest of the general public to prevent pollution in these waterways, for the benefit of their ecosystems, and for the benefits of all individuals and communities who use these waterways for various recreational, educational, and spiritual purposes.

This letter addresses Matheson's unlawful discharge of pollutants from the Facility via indirect flow into the San Francisco Bay, and the overall San Francisco Bay Watershed.[1]  Specifically, investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the National Pollutant Discharge Elimination System ("NPDES") General Permit No CAS000001 [State Water Resources Control Board] Water Quality Orders No. 2014-0057-DWQ (the "Industrial Stormwater Permit" or the "IGP") and 92-12-DWQ (as amended by Order No. 97-03-DWQ) (the "Previous Industrial Stormwater Permit").[2]

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of his or her intent to file suit.  33 U.S.C. § 1365(b).  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur.  As required by section 505(b), this Notice of Violation and Intent to File Suit provides notice to Matheson of the violations that have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and the Intent to File Suit, Johnson intends to file suit in federal court against Matheson under CWA section 505(a) for the violations described more fully below.

During the 60-day notice period, Johnson is willing to discuss effective remedies for the violations noticed in this letter.  We suggest that Matheson contact Johnson's attorneys at Brodsky Smith within the next twenty (20) days so that these discussions may be completed by the conclusion of the 60-day notice period.  Please note that we do not intend to delay the filing of a complaint in federal court, and service of the complaint shortly thereafter, even if discussions are continuing when the notice period ends.

## I.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.     The Facility

Matheson's Facility is located at 6775 Central Ave., Newark, CA 94560.  At the Facility, Matheson operates as a producer and manufacturer of industrial gases.  At the Facility, the following industrial activities occur: (i) manufacturing of industrial gases, specifically nitrogen, oxygen, hydrogen, and argon; (ii) hazardous material storage; (iii) product storage; (iv) waste storage; and (v) shipping and receiving.  Other activities carried out in the regular course of business at the Facility include storage of fuel and other oils, maintenance, equipment storage, and waste storage.  Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.  Possible pollutants from the Facility include total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris, hazardous materials, oil and grease ("O&G"), nitrogen, pH, heavy metals such as, iron and aluminum, as well as other pollutants.  Stormwater from the Facility discharges, indirectly, into the San Francisco Bay, and the overall San Francisco Bay Watershed.

---

[1] Matheson's Notice of Intent ("NOI") for the Facility filed with the San Francisco Bay Regional Water Quality Control Board ("SFBRWQCB") lists the receiving waters of the Facility as "San Francisco Bay". However, Matheson's SWPPP lists the receiving water as the Plummer Creek via municipal storm sewer system.  Upon investigation, it is Johnson's knowledge and belief that the most immediate receiving water of the Facility is the Plummer Creek, via indirect flow.  Stormwater discharges then flow which then flow into the San Francisco Bay approximately 2 miles after their entry point into the Plummer Creek, and thereafter ultimately reach the Pacific Ocean.

[2] On April 1, 2014, the State Water Resources Control Board adopted an updated NPDES General Permit for Discharges Associated with Industrial Activity, Water Quality Order No. 2014-57-DWQ, which has taken force or effect on its effective date of July 1, 2015.  The IGP has since been amended with the most recent changes becoming effective as of June 30, 2020.  As of the effective date, Water Quality Order No. 2014-57-DWQ has superseded and rescinded the prior Industrial Stormwater Permit except for purposes of enforcement actions brought pursuant to the prior permit.

B.    **The Affected Water**

The San Francisco Bay and the overall San Francisco Bay Watershed are waters of the United States. The CWA requires that water bodies such as the San Francisco Bay and the overall San Francisco Bay Watershed meet water quality objectives that protect specific "beneficial uses." The beneficial uses of the San Francisco Bay and the overall San Francisco Bay Watershed include commercial and sport fishing, estuarine habitat, fish migration, navigation, preservation of rare and endangered species, water contact and non-contact recreation, shellfish harvesting, fish spawning, and wildlife habitat. Contaminated stormwater from the Facility adversely affects the water quality of the San Francisco Bay and the overall San Francisco Bay Watershed, and threatens the beneficial uses and ecosystem of these watersheds, which includes habitats for threatened and endangered species.

II.    **THE FACILITY'S VIOLATIONS OF THE CLEAN WATER ACT**

It is unlawful to discharge pollutants to waters of the United States, such as the San Francisco Bay and the overall San Francisco Bay Watershed, without an NPDES permit or in violation of the terms and conditions of an NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The Industrial Stormwater Permit authorizes certain discharges of stormwater, conditioned on compliance with its terms.

Matheson has submitted a Notice of Intent ("NOI") to be authorized to discharge stormwater from the Facility under the Industrial Stormwater Permit since as early as 1992. However, information available to Johnson indicates that stormwater discharges from the Facility have violated several terms of the Industrial Stormwater Permit and the CWA. Apart from discharges that comply with the Industrial Stormwater Permit, the Facility lack NPDES permit authorization for any other discharges of pollutants into waters of the United States.

A.    **Discharges in Excess of BAT/BCT Levels**

The Effluent Limitations of the Industrial Stormwater Permit prohibit the discharge of pollutants from the facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants[3] and best conventional pollutant control technology ("BCT") for conventional pollutants.[4] Industrial Stormwater Permit §§ I(D)(32), II(D)(2), V(A); Previous Industrial Stormwater Permit, Order Part B(3). The EPA has published Benchmark values set at the maximum pollutant concentration present if an industrial facility is employing BAT and BCT, as listed in Attachment 1 to this letter.[5] These benchmark values are reiterated and incorporated into the Industrial Stormwater Permit. *See* Industrial Stormwater Permit § XI(B) Tables 1-2.

Additionally, the Previous Industrial Stormwater Permit notes that effluent limitation guidelines for several named industrial categories have been established and codified by the Federal Government. *See* Previous Industrial Stormwater Permit pp. VIII. The Previous Industrial Stormwater Permit mandates that for Facility that fall within such industrial categories, compliance with the listed BAT and BCT for the specified pollutants listed therein must be met in order to be in compliance with the Previous Industrial Stormwater Permit. *Id.* Matheson falls within these named industrial categories and it must have complied with the effluent limitations found therein in order to have been in compliance with the Previous Industrial

---

[3] BAT is defined at 40 C.F.R. § 437.1 *et seq.* Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.

[4] BCT is defined at 40 C.F.R. § 437.1 *et seq.* Conventional pollutants are listed at 40 C.F.R. § 401.16 and include BOD, TSS, oil and grease, pH, and fecal coliform.

[5] The Benchmark values are part of the EPA's Multi-Sector General Permit ("MSGP") and can be found at: https://www.epa.gov/npdes/final-2015-msgp-documents.

Stormwater Permit during its effective period.  In addition, the Industrial Stormwater Permit requires dischargers to comply with Effluent Limitations "consistent with U.S. EPA's Multi Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "MSGP")".  *See* Industrial Stormwater Permit § I(D)(33).  The MSGP has set both specific numeric effluent limitations and numeric action levels based upon Standard Industrial Classification ("SIC") codes.  Furthermore, these SIC code based benchmark values are reiterated and incorporated into the Industrial Stormwater Permit.  *See* Industrial Stormwater Permit § XI(B) Tables 1-2.  Notably, the Matheson Facility is classified as falling under SIC Code 2813, relating to Industrial Gases, requiring it to be within numerical effluent limitations for (i) pH; (ii) Oil and Grease; (iii) Total Suspended Solids; (iv) Aluminum; (v) Iron; and (vi) Nitrate plus Nitrite Nitrogen ("N+N").  Based on Matheson's self-reporting data and/or lack thereof at the Facility, Matheson has not met this requirement is currently in violation of the IGP, and has committed violations of the IGP several times over a period of approximately at least the past five (5) years.

Matheson's self-reporting of industrial stormwater discharges and/or lack thereof show a pattern of exceedances of Benchmark values and/or a failure to adequately monitor numerical pollutant discharge values for the most current annual reporting period as well as for previous years.  *See* Attachment 2.  This pattern of a exceedances of benchmark values and/or a lack of self-reporting indicate that Matheson has failed and is failing to employ measures that constitute BAT and BCT in violation of the requirements of the Industrial Stormwater Permit and Previous Industrial Stormwater Permit.  Johnson alleges and notifies Matheson that its stormwater discharges from the Facility have contained and likely continue to contain levels of pollutants that exceed benchmark values for Iron, Aluminum, Zinc and/or N+N including annual and/or instantaneous NAL overages for some or all such parameters for the current annual reporting period and/or for previous annual reporting period(s) within the past five (5) years. Moreover, the Facility not tested for all required qualifying storm events ("QSEs") in the same time period.  Consequently, stormwater discharges from the Facility are likely to have contained and likely continue to contain levels of pollutants that exceed benchmark values and NAL levels for the required pollutant parameters applicable to the Facility.

Matheson's ongoing discharges of stormwater containing levels of pollutants likely above EPA Benchmark values and BAT and BCT based levels of control also demonstrate that Matheson has not developed and implemented sufficient Best Management Practices ("BMPs") at the Facility.  Proper BMPs could include, but are not limited to, moving certain pollution-generating activities under cover or indoors capturing and effectively filtering or otherwise treating all stormwater prior to discharge, frequent sweeping to reduce build-up of pollutants on-site, installing filters on downspouts and storm drains, and other similar measures.

Matheson's failure to develop and/or implement adequate pollution controls to meet BAT and BCT and the Facility violates and will continue to violate the CWA and the Industrial Stormwater Permit each and every day Matheson's discharges stormwater without meeting BAT/BCT.  Johnson alleges that Matheson has discharged stormwater likely containing excessive levels of pollutants from the Facility to the San Francisco Bay and the overall San Francisco Bay Watershed  during at least every significant local rain event over 0.1 inches in at least the last five (5) years.[6]  Attachment 3 compiles all dates in at least the last five (5) years when a significant rain event occurred.  Matheson is subject to civil penalties for each violation of the Industrial Stormwater Permit and the CWA within at least the past five (5) years.

B.    **Discharges Impairing Receiving Waters**

The Industrial Stormwater Permit's Discharge Prohibitions disallow stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.  *See* Industrial Stormwater Permit § III; Previous Industrial Stormwater Permit, Order Part A(2).  The Industrial Stormwater Permit also prohibits stormwater discharges to surface or groundwater that adversely impact human health or the environment. *See* Industrial Stormwater Permit § VI(b)-(c); Previous Industrial Stormwater Permit, Order Part C(1). Receiving Water Limitations of the Industrial Stormwater Permit prohibit stormwater discharges that cause

---

[6] Significant local rain events are reflected in the rain gauge data available at: http://www.ncdc.noaa.gov/cdo-web/search.

or contribute to an exceedance of applicable Water Quality Objectives ("WQO") contained in a Statewide Water Quality Control Plan or the applicable Regional Water Board's Basin Plan. *See* Industrial Stormwater Permit § VI(a); Previous Industrial Stormwater Permit at Order Part C(2). Applicable WQO are set forth in the California Toxic Rule ("CTR")[7] and Chapter 3 of the San Francisco Bay Region (Region 2) Water Quality Control Plan (the "Basin Plan").[8] Exceedances of WQO are violations of the Industrial Stormwater Permit, the CTR, and the Basin Plan.

The Basin Plan establishes WQO for all Surface waters of San Francisco Bay Region, including but not limited to the following:

- Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial users.

- Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. Increases from normal background light penetration or turbidity relatable to waste discharge shall not be greater than 10 percent in areas where natural turbidity is greater than 50 NTU.

- All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce detrimental responses to aquatic organisms.

Johnson alleges that Matheson's stormwater discharges from the Facility have caused or contributed to exceedances of Receiving Water Limitations in the Industrial Stormwater Permit and the WQO set forth in the Basin Plan and CTR. These allegations are based on Matheson's self-reported data, or lack thereof, submitted to the San Francisco Bay Regional Water Quality Control Board. These sampling results, or lack thereof, indicate that Matheson's discharges are causing or threatening to cause pollution, contamination, and/or nuisance; adversely impacting human health or the environment; and violating applicable WQO.

Johnson alleges that each day that Matheson has discharged stormwater from the Facility, Matheson's stormwater has and/or may have contained levels of pollutants that exceeded one or more of the Receiving Water Limitations and/or applicable WQO in the San Francisco Bay and the overall San Francisco Bay Watershed. Johnson alleges that Matheson has discharged stormwater exceeding Receiving Water Limitations and/or WQO from the Facility to the San Francisco Bay and the overall San Francisco Bay Watershed during at least every significant local rain event over 0.1 inches in the last five (5) years. *See* Attachment 3. Each discharge from the Facility that violate a Receiving Water Limitation or has caused or contributed, or caused or contributes, to an exceedance of an applicable WQO constitutes a separate violation of the Industrial Stormwater Permit and the CWA; Matheson is subject to penalties for each violation of the Industrial Stormwater Permit and the CWA within at least the past five (5) years.

**C.      Failure to Develop and Implement an Adequate Stormwater Pollution Prevention Plan**

The Industrial Stormwater Permit requires dischargers to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP"). *See* Industrial Stormwater Permit, § X(B); Previous Industrial Stormwater Permit § A(1)(a). The Industrial Stormwater Permit also requires dischargers to make all necessary revisions to existing SWPPPs promptly. *See* Industrial Stormwater Permit, § X(B); Previous Industrial Stormwater Permit at Order Part E(2).

---

[7] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31, 682 (May 18, 2000).

[8] The Basin Plan is published by the San Francisco Bay Regional Water Quality Control Board at: https://www.waterboards.ca.gov/sanfranciscobay/basin_planning.html.

The SWPPP must include, among other requirements, the following: a site map, a list of significant materials handled and stored at the site, a description and assessment of all Matheson's pollutant sources, a description of the BMPs that will reduce or prevent pollutants in stormwater discharges, specification of BMPs designed to reduce pollutant discharge to BAT and BCT levels, a comprehensive site compliance evaluation completed each reporting year, and revisions to the SWPPP within 90 days after a facility manager determines that the SWPPP is in violation of any requirements of the Industrial Stormwater Permit. *See* Industrial Stormwater Permit, § X(A); Previous Industrial Stormwater Permit Section § A.

Based on information available to Johnson, Matheson has failed to prepare and/or implement an adequate SWPPP at the Facility and/or failed to revise the SWPPP at the Facility to satisfy each of the requirements of § X(A) of the Industrial Stormwater Permit and/or § A Previous Industrial Stormwater Permit. For Example, the Matheson Facility SWPPP does not include and/or Matheson has not implemented adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels in accordance with Section A(8) of the Industrial Stormwater Permit, as evidenced by the data or lack thereof in Attachment 2. For example, Matheson has clearly failed to create and implement adequate BMPs as reflected by the NAL exceedances of the pollutant parameters of Iron, Aluminum, Zinc and/or N+N including annual and/or instantaneous NAL overages for some or all such parameters for the current annual reporting period and/or for previous annual reporting period(s) within the past five (5) years. Additionally, the Matheson Facility SWPPP does not include and/or Matheson has not implemented an adequate Monitoring and Reporting Program at the Facility, as evidenced by its failure to properly submit testing of requisite amount of Qualifying Storm Events in the past five (5) years.

Accordingly, Matheson has violated the CWA each and every day that it has failed to develop and/or implement an adequate SWPPP meeting all of the requirements of § X(A) of the Industrial Stormwater Permit and/or § A Previous Industrial Stormwater Permit, and Matheson will continue to be in violation every day until it develops and implements an adequate SWPPP at the Facility. Matheson is subject to penalties for each violation of the Industrial Stormwater Permit and the CWA occurring within at least the past five (5) years.

D.     **Failure to Develop and Implement an Adequate Monitoring and Reporting Program and to Perform Annual Comprehensive Site Compliance Evaluations**

The Industrial Stormwater Permit requires facility operators to develop and implement a Monitoring and Reporting Program ("MRP"). *See* Industrial Stormwater Permit, § XI; Previous Industrial Stormwater Permit § B(1) and Order Part E(3). The Industrial Stormwater Permit requires that MRP ensure that the facility's stormwater discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial Stormwater Permit. *Id.* Facility operators must ensure that their MRP practices reduce or prevent pollutants in stormwater and authorized non-stormwater discharges as well as evaluate and revise their practices to meet changing conditions at the facility. *Id.* This may include revising the SWPPP as required by § X(A) of the Industrial Stormwater Permit and/or §A Previous Industrial Stormwater Permit.

The MRP must measure the effectiveness of BMPs used to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges, and facility operators must revise the MRP whenever appropriate. *See* Industrial Stormwater Permit, § XI; Previous Industrial Stormwater Permit § at Section B. The Industrial Stormwater Permit requires facility operators to visually observe and collect samples of stormwater discharges from all drainage areas. *Id.* Facility operators are also required to provide an explanation of monitoring methods describing how the facility's monitoring program will satisfy these objectives. *Id.*

Matheson has been operating the Facility with inadequately developed and/or inadequately implemented MRPs, in violation of the substantive and procedural requirements set forth in Section B of the Industrial Stormwater permit. For example, the data in Attachment 2 indicates that Matheson's monitoring program has not ensured that stormwater discharges from the Facility are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial Stormwater Permit as required by the Industrial Stormwater Permit, § XI and/or the Previous Industrial Stormwater Permit § B.

The monitoring has not resulted in practices at the Facility that adequately reduce or prevent pollutants in stormwater as required by Industrial Stormwater Permit, § XI and/or the Previous Industrial Stormwater Permit § B. Additionally, the Industrial Stormwater Permit requires dischargers to comply with Effluent Limitations "consistent with U.S. EPA's Multi Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "MSGP")". The MSGP has set both specific numeric effluent limitations and numeric action levels based upon Standard Industrial Classification ("SIC") codes. Furthermore, these SIC code based benchmark values are reiterated and incorporated into the Industrial Stormwater Permit. *See* Industrial Stormwater Permit § XI(B) Tables 1-2. Notably, Matheson Facility is classified as falling under SIC Code 2813, relating to Industrial Gases, requiring it to be within numerical effluent limitations for (i) pH; (ii) Oil and Grease; (iii) Total Suspended Solids; (iv) Aluminum; (v) Iron; and (vi) Nitrate plus Nitrite Nitrogen ("N+N"). As previously stated, and in clear violation of the terms of the Industrial Stormwater Permit, Matheson has reported benchmark exceedances and/or failed to report testing results for applicable effluent limitation for some or all parameters for the current annual reporting period and for previous annual reporting period(s) within the past five (5). *See* Attachments 2, 3. Therefore, the data in Attachment 2 indicates that Matheson's monitoring program has not effectively identified or responded to compliance problems at the Facility or resulted in effective revision of the BMPs in use or the Facility SWPPP to address such ongoing problems as required by Industrial Stormwater Permit, § XI and/or the Previous Industrial Stormwater Permit § B.

As a part of the MRP, the Industrial Stormwater Permit specifies that facility operators shall collect a total of four (4) stormwater samples throughout an annual reporting period. Specifically the Industrial Stormwater Permit requires, "The discharger to collect and analyze samples from two (2) Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30)." Industrial Stormwater Permit § XI B(2).[9] Furthermore, should facility operators fail to collect samples from the first storm event of the wet season, they are still required to collect samples from two other storm events during the wet season, and explain in the annual report why the first storm event was not sampled. *Id.* Despite this requirement Matheson has failed to meet this testing threshold requirement for at least two annual reporting period in the past five (5) years. Matheson has not submitted adequate explanations for such missing data.

The Industrial Stormwater Permit also requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board. *See* Industrial Stormwater Permit, Fact Sheet § O and/or Previous Industrial Stormwater Permit § B(14). Notably, Matheson has failed to meet this testing threshold requirement for at least two annual reporting period in the past five (5) years. Matheson has not submitted adequate explanations for such missing data.

As a result of Matheson's failure to adequately develop and/or implement an adequate MRPs at the Facility, Matheson has been in daily and continuous violation of the Industrial Stormwater Permit and the CWA each and every day for at least the past five (5) years. These violations are ongoing. Matheson will continue to be in violation of the monitoring and reporting requirement each day that Matheson fails to adequately develop and/or implement an effective MRPs at the Facility. Matheson is subject to penalties for each violation of the Industrial Stormwater Permit and the CWA occurring for at least the last five (5) years.

E.    **Failure to Comply with Level 1 and Level 2 Exceedance Response Action Requirements**

When the Industrial Stormwater Permit became effective on July 1, 2015, all permitted Facility were placed into "baseline status" for all parameters listed in Table 2 of the Industrial Stormwater Permit. Industrial Stormwater Permit § XII(B). Permitted Facility are placed into "Level 1 Status" if sampling indicates that an annual or instantaneous NAL exceedance for an applicable pollutant parameter has occurred. Industrial Stormwater Permit § XII(C). Level 1 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred, and the discharger enters the Exceedance Response Action

---

[10] Under the Previous Industrial Stormwater Permit, only two samplings per year was required, specifically, from "the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season." *See* Previous Industrial Stormwater Permit § B(5)(a).

("ERA") process.  *Id.*  The ERA process requires the discharger to conduct an evaluation, assisted by a Qualified Industrial Storm Water Practitioner (a "QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following the commencement of Level 1 Status.  *Id.*  The evaluation must also include the identification of the "corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit."  *Id.*  Furthermore, the Industrial Stormwater Permit states, "Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated."  *Id.*  If such remediation is not effective, and NAL exceedances for the affected pollutant parameter occurs for a second consecutive annual reporting period, the Facility is placed into "Level 2" status, requiring further remediation, analysis, reporting, and action.  *Id.*

Based upon Level 1 and Level 2 status evaluations, a discharger is required, as soon as practicable but no later than January 1 following the commencement of Level 1 or Level 2 status, to prepare a Level 1 ERA Report or Level 2 ERA Action Plan, as applicable.  Industrial Stormwater Permit § XII(C)(2).  The Level 1 ERA Report and/or Level 2 ERA Action Plan must be prepared by a QISP and include a summary of the Level 1 and/or Level 2 ERA evaluation(s) and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL.  *Id.*  The SWPPP revisions and additional BMP development and implementation must also be completed by January 1 following the commencement of Level 1 and/or Level 2 status, and the Level 1 or Level 2 status discharger is required to submit via SMARTS the Level 1 ERA Report or Level 2 ERA Action Plan certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed.  *Id.*  The certification is also required to provide the QISP's identification number, name, and contact information no later than January 1 following commencement of level 1 status.  *Id.*

A permitted discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report or Level 2 ERA Action Plan has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.  Industrial Stormwater Permit § XII(C)(2)(b).  A permitted discharger will enter "Level 2 status" if there are any NAL exceedances for the same parameter when the discharger is in Level 1 status.  Industrial Stormwater Permit § XII(D).  Upon entry into Level 2 status, a discharger shall submit a Level 2 ERA Action Plan by January 1 following the reporting year during which NAL exceedance(s) occurred placing the discharger into Level 2 Status.  *Id.*  Additionally, a permitted discharger in Level 2 Status is required to submit a Level 2 ERA Technical Report on January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, which shall include, amongst other things a summary and report of the implemented BMPs implemented and their effect on pollution reduction.  *Id.*

Matheson has failed to meet the requirements of the ERA process within at least the last five (5) years.  Notably the Facility is currently in Level 2 for the parameters of Iron and Aluminum, due to repeated NAL overages of these pollutants every year for the previous five (5) annual reporting period.  In an attempt to explain this, the Facility submitted in December of 2019 a Level 2 ERA Technical Report – Natural Background Pollutant Source Demonstration, for these parameters as well as a Non-Industrial Pollutant Source Demonstration Report for the parameter of Zinc, which the Facility had NAL exceedances for in three out of the last five annual reporting period.  However these reports do not address several likely industrial sources for such pollutants (including, but not limited to, from painting operations at the Facility), nor do these reports address discuss why the run-on from the unpaved areas around the facility have not been controlled with adequate BMPs to prevent such pollutants from entering the Facility's stormwater discharges.  For these reasons, it is clear that these ERA report(s) issued by Matheson are insufficient.

As a result of Matheson's failure to properly comply with the ERA process, Matheson has been in daily and continuous violation of the Industrial Stormwater Permit and the CWA, constituting a pattern of violations within a period of the last five (5) years.  These violations are ongoing.  Matheson will continue to be in violation of the monitoring and reporting requirement each day that Matheson fails to adequately develop and/or implement an adequate ERA Level 1 ERA Report, Level 2 ERA Action Plan, and/or Level 2

8

ERA Technical Report(s) at the Facility, and update its SWPPP as necessary. Matheson is subject to penalties for each violation of the Industrial Stormwater Permit and the CWA occurring for the last five (5) years.

### F.    Unpermitted Discharges

Section 301(a) of the CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge is authorized by a NPDES Permit issued pursuant to Section 402 of the CWA. *See* 33 U.S.C. §§ 1311(a), 1342. Matheson sought coverage for the Facility under the Industrial Stormwater Permit, which states that any discharge from an industrial facility not in compliance with the Industrial Stormwater Permit "must be either eliminated or permitted by a separate NPDES permit." Industrial Stormwater Permit, § III; Previous Industrial Stormwater Permit, Order Part A(1). Because Matheson has not obtained coverage under a separate NPDES permit and has failed to eliminate discharges not permitted by the Industrial Stormwater Permit, each and every discharge from the Facility described herein not in compliance with the Industrial Stormwater Permit has constituted and will continue to constitute a discharge without CWA Permit coverage in violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a)

## IV.    PERSON RESPONSIBLE FOR THE VIOLATIONS

Matheson Tri-Gas, Inc. is the person responsible of the violations at the Facility described above.

## V.    NAME AND ADDRESS OF NOTICING PARTY

Jason Johnson
4060 Oak Hill Rd.
Oakland, CA 94605
707-694-0353

## VI.    COUNSEL

Evan J. Smith, Esquire
esmith@brodskysmith.com
Ryan P. Cardona, Esquire
rcardona@brodskysmith.com
Brodsky Smith
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212
T: (877) 534-2590
F: (310) 247-0160

## VII.    REMEDIES

Johnson intends, at the close of the 60-day notice period or thereafter, to file a citizen suit under CWA section 505(a) against Matheson for the above-referenced violations. Johnson will seek declaratory and injunctive relief to prevent further CWA violations pursuant to CWA sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), and such other relief as permitted by law. In addition, Johnson will seek civil penalties pursuant to CWA section 309(d), 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, against Matheson in this action. The CWA imposes civil penalty liability of up to $64,618.00 per day per violation for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4. Johnson will seek to recover attorneys' fees, experts' fees, and costs in accordance with CWA section 505(d), 33 U.S.C. § 1365(d).

As noted above, we are willing to meet with you during the 60-day notice period to discuss effective remedies for the violations noted in this letter.  Please contact me to initiate these discussions.

Sincerely,

*Evan J. Smith*

Evan J. Smith, Esquire
esmith@brodskysmith.com
Ryan P. Cardona, Esquire
rcardona@brodskysmith.com
BRODSKY SMITH
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA
T: (877) 534-2590
F: (310) 247-0160

**ATTACHMENT 1: EPA BENCHMARKS AND WATER QUALITY STANDARDS FOR DISCHARGES TO FRESHWATER**

**EPA Benchmarks, Multi-Sector General Permit ("MSGP") & IGP**

| Parameter | Units | Benchmark Value | Source |
|---|---|---|---|
| pH | pH Units | Less than 6.0 Greater than 9.0 (Instantaneous) | MSGP; Industrial Stormwater Permit § XI(B) Tables 1-2 |
| Oil & Grease | Mg/L | 25 (Instantaneous) 15 (Annual) | MSGP; Industrial Stormwater Permit § XI(B) Tables 1-2 |
| Total Suspended Solids | Mg/L | 400 (Instantaneous) 100 (Annual) | MSGP; Industrial Stormwater Permit § XI(B) Tables 1-2 |
| Aluminum | Mg/L | 0.75 (Annual) | MSGP; Industrial Stormwater Permit § XI(B) Tables 1-2 |
| Iron | Mg/L | 1.00 (Annual) | MSGP; Industrial Stormwater Permit § XI(B) Tables 1-2 |
| Nitrate + Nitrite Nitrogen | Mg/L | 0.68 (Annual) | MSGP; Industrial Stormwater Permit § XI(B) Tables 1-2 |

**ATTACHMENT 2: TABLE OF EXCEEDENCES FOR
MATHESON TRI-GAS, INC.**

The following table contains all stormwater sampling results which exceeds EPA Benchmarks and/or causes or contributes to an exceedance of CFR and/or Basin Plan Water Quality Standards. All EPA Benchmarks and CFR and/or Basin Plan Water Quality Standards are listed in Attachment 1. All stormwater samples were reported by the Facility during the past five (5) years.

| Reporting Period | Sample Date | Parameter | Result | Unit |
|---|---|---|---|---|
| 2022-2023 | 03/21/2023 | Al | 1.00 | Mg/L |
| 2022-2023 | 03/10/2023 | Fe | 1.60 | Mg/L |
| 2022-2023 | 03/10/2023 | Al | 0.85 | Mg/L |
| 2022-2023 | 12/01/2022 | Fe | 1.60 | Mg/L |
| 2022-2023 | 12/01/2022 | Al | 1.20 | Mg/L |
| 2021-2022 | 03/29/2022 | Fe | 6.00 | Mg/L |
| 2021-2022 | 03/29/2022 | Al | 3.10 | Mg/L |
| 2021-2022 | 03/29/2022 | Zn | 0.42 | Mg/L |
| 2021-2022 | 01/07/2022 | Zn | 2.70 | Mg/L |
| 2020-2021 | 03/18/2021 | Fe | 4.00 | Mg/L |
| 2020-2021 | 03/18/2021 | Al | 1.80 | Mg/L |
| 2020-2021 | 02/12/2021 | Fe | 1.10 | Mg/L |
| 2020-2021 | 02/02/2021 | Fe | 1.90 | Mg/L |
| 2020-2021 | 02/02/2021 | Al | 1.00 | Mg/L |
| 2020-2021 | 02/02/2021 | N+N | 0.96 | Mg/L |
| 2020-2021 | 01/22/2021 | Fe | 10.00 | Mg/L |
| 2020-2021 | 01/22/2021 | Al | 3.80 | Mg/L |
| 2020-2021 | 01/22/2021 | Zn | 0.88 | Mg/L |
| 2020-2021 | 01/22/2021 | N+N | 1.10 | Mg/L |
| 2020-2021 | 11/17/2020 | Fe | 6.80 | Mg/L |
| 2020-2021 | 11/17/2020 | Al | 3.00 | Mg/L |
| 2020-2021 | 11/17/2020 | Zn | 1.20 | Mg/L |
| 2020-2021 | 11/17/2020 | N+N | 2.23 | Mg/L |
| 2019-2020 | 01/16/2020 | Fe | 13.00 | Mg/L |
| 2019-2020 | 01/16/2020 | Al | 8.00 | Mg/L |
| 2019-2020 | 01/16/2020 | Zn | 0.28 | Mg/L |
| 2019-2020 | 12/18/2019 | Fe | 3.10 | Mg/L |
| 2019-2020 | 12/18/2019 | Al | 2.00 | Mg/L |
| 2019-2020 | 12/18/2019 | Zn | 0.37 | Mg/L |
| 2018-2019 | 02/27/2019 | Zn | 0.27 | Mg/L |
| 2018-2019 | 02/01/2019 | Fe | 1.40 | Mg/L |
| 2018-2019 | 02/01/2019 | Al | 0.97 | Mg/L |
| 2018-2019 | 02/01/2019 | N+N | 0.79 | Mg/L |
| 2018-2019 | 01/21/2019 | Fe | 2.10 | Mg/L |
| 2018-2019 | 01/21/2019 | Al | 1.20 | Mg/L |
| 2018-2019 | 01/21/2019 | N+N | 1.00 | Mg/L |
| 2018-2019 | 01/12/2019 | Fe | 4.00 | Mg/L |
| 2018-2019 | 01/12/2019 | Al | 2.10 | Mg/L |
| 2018-2019 | 01/12/2019 | Zn | 0.38 | Mg/L |
| 2018-2019 | 01/12/2019 | N+N | 1.00 | Mg/L |
| 2018-2019 | 01/05/2019 | Fe | 2.80 | Mg/L |
| 2018-2019 | 01/05/2019 | Al | 1.50 | Mg/L |
| 2018-2019 | 01/05/2019 | Zn | 0.46 | Mg/L |
| 2018-2019 | 01/05/2019 | N+N | 1.06 | Mg/L |

| 2018-2019 | 12/05/2018 | Fe  | 1.40 | Mg/L |
|-----------|------------|-----|------|------|
| 2018-2019 | 12/05/2018 | Al  | 1.10 | Mg/L |
| 2018-2019 | 12/05/2018 | N+N | 0.91 | Mg/L |
| 2018-2019 | 11/28/2018 | Fe  | 1.70 | Mg/L |
| 2018-2019 | 11/28/2018 | Al  | 1.20 | Mg/L |
| 2018-2019 | 11/28/2018 | Zn  | 0.31 | Mg/L |
| 2018-2019 | 11/28/2018 | N+N | 1.09 | Mg/L |

* Matheson's submitted testing data indicates an average annual NAL exceedances for the pollutant parameters of Iron and Aluminum in the 2022-2023 annual reporting period, for Iron, Aluminum and Zinc, in the 2021-2022 annual reporting period, for Iron, Aluminum, Zinc, and N+N in the 2020-2021 annual reporting period, for Iron, Aluminum, and Zinc in the 2019-2020 annual reporting period, and for Iron, Aluminum, and N+N in the 2018-2019 annual reporting period.

* Matheson has submitted stormwater testing data for only two (2) QSEs within the 2021-2022 and 2019-2020 annual reporting periods.

**ATTACHMENT 3: ALLEGED DATES OF EXCEEDANCES BY
MATHESON TRI-GAS, INC.
January 1, 2018 – July 13, 2023**

Days with precipitation one-tenth of an inch or greater, as reported by NOAA's National Climatic Data Center, Station(s): Fremont, CA US USC00043244 when a stormwater discharge from the Facility is likely to have occurred.  http://www.ncdc.noaa.gov/cdo-web/search

| 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|------|
| 1/3 | 1/6 | 1/9 | 1/4 | 3/28 | 1/1 |
| 1/4 | 1/7 | 1/16 | 1/25 | 4/11 | 1/3 |
| 1/6 | 1/16 | 1/26 | 1/27 | 4/16 | 1/4 |
| 1/8 | 1/17 | 3/14 | 1/28 | 4/21 | 1/5 |
| 1/9 | 1/21 | 3/15 | 1/29 | 4/22 | 1/8 |
| 1/19 | 1/31 | 3/16 | 2/12 | 9/19 | 1/9 |
| 1/22 | 2/2 | 3/25 | 2/15 | 11/1 | 1/10 |
| 1/25 | 2/3 | 4/5 | 3/6 | 11/7 | 1/11 |
| 2/26 | 2/4 | 4/6 | 3/10 | 11/8 | 1/13 |
| 2/27 | 2/5 | 5/17 | 3/15 | 12/1 | 1/14 |
| 3/1 | 2/8 | 5/18 | 3/18 | 12/3 | 1/15 |
| 3/2 | 2/10 | 5/19 | 10/21 | 12/4 | 1/16 |
| 3/3 | 2/13 | 11/17 | 10/22 | 12/10 | 1/19 |
| 3/13 | 2/14 | 12/12 | 10/24 | 12/11 | 2/3 |
| 3/14 | 2/15 | 12/13 | 10/25 | 12/12 | 2/4 |
| 3/16 | 2/16 | 12/17 | 11/1 | 12/27 | 2/5 |
| 3/20 | 2/17 | 12/31 | 12/13 | 12/29 | 2/24 |
| 3/21 | 2/27 | | 12/14 | 12/30 | 2/27 |
| 3/22 | 3/2 | | 12/16 | 12/31 | 2/28 |
| 4/6 | 3/6 | | 12/22 | | 3/5 |
| 4/7 | 3/10 | | 12/23 | | 3/7 |
| 4/12 | 3/20 | | 12/24 | | 3/8 |
| 4/16 | 3/23 | | 12/25 | | 3/9 |
| 11/21 | 3/26 | | 12/26 | | 3/10 |
| 11/23 | 3/27 | | 12/27 | | 3/12 |
| 11/24 | 4/2 | | | | 3/14 |
| 11/28 | 4/16 | | | | 3/19 |
| 11/29 | 5/16 | | | | 3/21 |
| 12/1 | 5/18 | | | | 3/22 |
| 12/5 | 5/19 | | | | 3/28 |
| 12/16 | 5/26 | | | | 3/29 |
| 12/17 | 9/16 | | | | 5/2 |
| 12/24 | 11/27 | | | | 5/6 |
| 12/25 | 11/30 | | | | |
| | 12/1 | | | | |
| | 12/4 | | | | |
| | 12/7 | | | | |
| | 12/8 | | | | |
| | 12/11 | | | | |
| | 12/18 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 12/22 | | | | |
| | 12/29 | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |